UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


SAMUEL W. WANI,

          Plaintiff,

   v.

GEORGE FOX UNIVERSITY; PROVIDENCE
MEDICAL GROUP; DR. THOMAS CROY,
M.D.; DOMINIC FIX-GONZALEZ; GREGG
BOUGHTON; CHRIS CASEY; JOHN BATES;
IAN SANDERS; GABE HABERLY; CRAIG
TAYLOR; DAVE JOHNSTONE; MARK
POTHOFF; and SARAH TAYLOR,

          Defendants.

Case No. 3:17-cv-01011-YY

FINDINGS AND
RECOMMENDATIONS


YOU, Magistrate Judge:

## INTRODUCTION

Plaintiff, Samuel Wani ("Wani"), proceeding *pro se*, alleges various claims all centered

on a hand injury he sustained during football practice at George Fox University ("GFU") in

August 2015, a social media post that same month by a former football teammate of Wani's,

Dominic Fix-Gonzalez ("Fix-Gonzalez"), and the response to those issues by GFU and its staff.

In his original Complaint, Wani alleged claims against Fix-Gonzalez, an orthopedic surgeon who

acted as the GFU football team's volunteer doctor, Dr. Thomas Croy ("Dr. Croy"), Providence

Medical Group ("Providence"), GFU, and nine GFU employees (collectively "the individual GFU defendants")[1] for:  (1) "Cyberbullying, racial verbal harassment" ("First Claim"); (2) two claims for Negligence, titled as claims for "Discrimination, medical false claim, fraud, negligence, and intentional infliction of  physical/emotional pain and suffering,"[2] ("Second Claim") and "Medical fraud, negligence and refusal of treatment," ("Third Claim"); (3) "Racial discrimination and hatred" ("Fourth Claim"); (4) "Wrongful Disclosure of Individually Identifiable Health Information  (HIPAA Violations)" ("Fifth Claim"); and (5) Breach of Contract ("Sixth Claim").  *Id*. at 9-11.  He seeks damages totaling over $70 million.  *Id*. at 8-11.

On September 28, 2017, Wani voluntarily dismissed all claims against Providence.  ECF #53.  On February 22, 2018, this court recommended granting the GFU defendants' motions against all but Wani's Fourth Claim.  F&R, ECF #128.  In late March 2018, the individual GFU defendants filed a Motion for Judgment on the Pleadings (ECF #138) against the Fourth Claim.  On April 5, 2018, Judge Hernandez adopted the F&R, dismissing the Fifth Claim with prejudice, and dismissing the First, Second, Third, and Sixth Claims against the GFU defendants without prejudice and elaborating on the additional allegations Wani would need to include to salvage those claims.  Order, ECF #146.  Three weeks passed with no indication that Wani intended to amend his pleadings.  Defendants then filed three additional motions, including Fix-Gonzalez's

---

[1]  The individual GFU defendants include the Dean of Students (Mark Pothoff ("Pothoff")), the Associate Dean of Students and Director of Community Life (Dave Johnstone ("Johnstone")), an administrative employee (Sarah Taylor), six individuals employed in various capacities with GFU's Athletic Department (Gregg Boughton ("Boughton," GFU's Head Football Athletic Trainer), Chris Casey ("Casey," Head Coach, Defensive Line), John Bates ("Bates," Defensive Coordinator), Ian Sanders ("Sanders," Special Teams Coordinator), Gabe Haberly ("Haberly," Wide Receiver Coordinator), and Craig Taylor (Director of Athletics).

[2]  Despite the title given these claims in Wani's Complaint, Wani later identified these as claims for "Negligence."  *Compare* Complaint 9-10, ECF #1 *with* Wani's Resp. 7-8, ECF #76.

Motion for Judgment on the Pleadings (ECF #148), Dr. Croy's Motion for Summary Judgment (ECF #149), and the GFU defendants' Motion for Summary Judgment (ECF #153).

More than six weeks after Judge Hernandez's ruling, Wani filed his response to Dr. Croy's summary judgment motion, indicating for the first time that he intended to file an amended pleading. Pl.'s Resp. M. Summ. J. 1, ECF #167. Wani then filed a Motion to File an Amended Complaint (ECF #168) on May 22, 2018, followed by a Motion for Sanctions (ECF #179) on June 6, 2018, and a Motion to Compel (ECF #182) on June 11, 2018. The parties thereafter completed briefing on all these motions, as well as on Wani's Motion for Summary Judgment (ECF #75), which was previously stayed. *See* ECF #132.

This court denies Wani's Motion to Compel (ECF #182) in the accompanying Order. *See* ECF #197. After a careful review of the pleadings and evidence in the light most favorable to Wani, this court recommends that: (1) Wani's Motion for Summary Judgment (ECF #75), Motion for Leave to File an Amended Complaint (ECF #168), and Motion for Sanctions (ECF #179) should be DENIED; and (2) the individual GFU defendants' Motion for Judgment on the Pleadings (ECF #138), Fix-Gonzalez's Motion for Judgment on the Pleadings (ECF #148), Dr. Croy's Motion for Summary Judgment (ECF #149), and the GFU defendants' Motion for Summary Judgment (ECF #153) should be GRANTED as against all remaining claims in Wani's original Complaint. To the degree these motions address matters not specifically discussed below, the motions should be DENIED as MOOT. Accordingly, this court should enter judgment for defendants on all claims.

**FINDINGS**

Defendants have submitted extensive and largely undisputed background factual information. This evidence provides the necessary underpinnings for the pending motions.

I.      **Material Facts**

Wani's claims arise out of events between August 20, 2015, when Wani injured his hand during football practice, and November 2016, when Wani had surgery to reconstruct a torn thumb ligament.  He alleges that GFU and its staff:  (1) denied him adequate medical attention or time off of practice for his injury; and (2) responded inadequately to social media posts by Fix-Gonzalez that Wani learned of on August 27, 2015.  The following factual statement comprises of a compilation of the well-pleaded factual allegations supporting Wani's claims previously set out in this court's Findings and Recommendation (ECF #128), along with the undisputed material facts now evident in the record, all viewed in the light most favorable to Wani.

Wani enrolled in GFU for the 2015-16 school year as a transfer student from Washington and moved to Newberg on or about August 11, 2015, four days before football camp started, and about three weeks before classes.  ECF #168-1, at 2.[3]  On August 19, 2015, Wani had what he characterizes as a "life threatening sickle cell related crisis" and "dismissed [him]self from practice."  *Id*.  When he arrived at practice three hours late, Casey sent him to the treatment room to be evaluated.  Head athletic trainer, Boughton, examined Wani and found nothing wrong, at which point he and Wani had an "unpleasant exchange of words."  *Id*; *see also* ECF #151-3, at 1. Other players had also been missing practice, prompting Casey to issue an edict that players were not to leave practice without approval from him or from one of the head athletic trainers.

The next day, immediately after morning practice, Wani experienced pain and noticed "abnormal major swelling on his left thumb."  Boughton found "no deformity," no swelling, and no effusion, and found that it appeared "to be a grade I sprain of the [ulnar collateral ligament]"

---

[3]  Many of the background facts relied on by Wani are found only in the proposed First Amended Complaint (ECF #168-1), where Wani provides considerably more detail regarding his claims than in the original Complaint.

and planned to "tape the thumb for practice," ice it after practice, and use a "thumb spica splint" the rest of the time. ECF #151-3, at 1. If it was "not better in a week," Boughton planned to refer Wani to Dr. Croy for an x-ray. *Id.* Wani disagreed with Boughton and insisted that his thumb was fractured. Boughton iced the thumb while Wani was at lunch, and taped it with athletic tape for the afternoon practice. ECF #168-1, at 3.

Boughton examined Wani's thumb again each of the next three days. ECF #151-3, at 2. He noted some swelling, and continued to recommend taping the thumb during practice and icing it afterward, and using a thumb spica brace between practices. *Id.* Wani told Boughton that his thumb was "beyond jammed," and asked to go see a doctor, but Boughton refused to let Wani off of practice to seek medical care. ECF #168-1, at 3.

The morning of Thursday, August 27, 2015, Wani learned that Fix-Gonzalez, a teammate, had posted an altered picture of him on social media comparing Wani's looks to that of a mop, changing Wani's skin color to be much darker and telling a fellow football teammates that he had to make Wani "extra crispy" by giving him some "extra vitamin D." Complaint 9, ECF #1; Johnstone Decl., Ex. C, p. 2, ECF #159. Fix-Gonzalez allegedly posted one or two other altered images of Wani, one that Wani heard other teammates referring to as an "Alice in Wonderland" photo, and the another of Wani as "Libby from Jimmy Neutron."[4] Complaint 9, ECF #1; Johnstone Decl., Ex. A, p. 2 and Ex. E., p. 1, ECF #159. Fix-Gonzalez approached Wani in the parking lot when Wani was getting ready to leave and told Wani he would take the posts down, but Wani told him to get out of his face and then left for lunch. Johnstone Decl., Ex. C, pp. 2-3, ECF #159.

---

[4] Wani's proposed First Amended Complaint refers to two previous pictures of Wani that Fix-Gonzalez allegedly created, apparently involving memes of Wani as Alice in Wonderland and "Libby from Jimmy Neutron." ECF #168-1 at 7.

That afternoon, Wani sent an email to Casey advising him that pictures of him had been posted on Twitter, including one of him as Alice in Wonderland and one portraying him as a mop. Casey Decl., Ex. A, ECF #156. Wani did not identify Fix-Gonzalez by name but told Casey he could not "be in the same room or team with this kind of stuff." *Id*. Casey called Wani that evening, told him that all of the social media posts had been removed, and then arranged to meet with Wani early the following afternoon. *Id*; Johnstone Decl., Ex. C, p. 2, ECF #159.

The following day, Casey held unscheduled meetings with the entire football coaching staff and with the entire football team to discuss GFU's social media policies. Casey Decl. ¶ 16, ECF #156. Casey also met privately with Fix-Gonzalez, and "made sure that he understood the seriousness of Mr. Wani's complaint as a potential violation of George Fox student and team policies." *Id*. ¶ 17. Fix-Gonzalez told Casey that he had already deleted his social media posts the prior day in Wani's presence and attempted to apologize to Wani. *Id*.

Casey then met with Wani, advising him that his investigation confirmed that the posts were apparently done by Fix-Gonzalez alone, on his own time and on his personal Instagram account, and were not part of a widespread pattern of conduct by any other team members. *Id*. Wani advised Casey that he was going to "take some time to get [his] mind straight" and would let Casey know his "final decision" on Monday, August 31, 2015. *Id*., Ex. A, p. 1.

Wani did not attend football team events for the next couple of days. By Sunday, August 30, 2015, Wani notified Casey that he had decided to "[f]orgive and move on." *Id*. He planned to join the team for practice on September 1, and asked for Fix-Gonzalez's phone number so that they could "shake hands [and] move forward past [their] differences." *Id*. Despite that email, Wani alleges he waited in vain for the coaches in GFU's athletic department to report Fix-Gonzalez's social media posts to GFU's administration, leaving Wani in what he contends was a

racially hostile environment at school and on the football team.  He later told Johnstone that he

went to practice on September 1, 2015, where Fix-Gonzalez shook his hand and told him he was

sorry, but that Wani felt "forced to move [on] by . . . Casey."  Johnstone Decl., Ex. D., p. 2, ECF

#159.

On Wednesday, September 2, 2015, at 2:57 p.m., Wani electronically submitted a form

withdrawing from GFU.  Jaqua Decl., Ex. C.  Shortly thereafter, a friend and mentor to Wani,

Mike Bujnowski ("Bujnowski") reported the social media posts by Fix-Gonzalez to Johnstone

(GFU's Associate Dean of Students and Director of Residence Life).  Complaint, Att. A, at 1-3,

ECF #1-1; Johnstone Decl. ¶ 4, ECF #159.  Bujnowski followed up with an email addressed to

Johnstone at 3:50 p.m., outlining the "three separate racially slurred, altered images of [Wani],"

advising that the content of the first post was currently unknown, the second picture was of Wani

with a "deeply blackened face," and attaching the third post, consisting of "a sequence of four

images with the first three zooming in on [Wani's] face and hair," with the last image in the

series being a "rag mop" as the "final transition of [Wani's] face and hair."  Johnstone Decl., Ex.

A, p. 2, ECF #159.  Bujnowski advised Johnstone that the "main perpetrator," showed no

remorse, and instead had stated to Wani that he had "another post ready to go."  *Id*.

Johnstone immediately advised other GFU administrators of the report by Bujnowski,

including Brad Lau (Vice President of Student Life and Title IX Coordinator), Pothoff (Dean of

Community Life and Title IX Deputy Coordinator), and Jenny Elsey (Associate Dean of

Intercultural Life).  *Id*. ¶ 5.  With hours, Johnstone contacted Wani and arranged to meet with

him on Friday, September 4, 2015.  *Id*. ¶ 6.  Johnstone asked Wani to provide him with notes

describing what had taken place as well as copies of whatever online material was directed at

him.  *Id*., Ex. B.

Late in the afternoon of September 2, 2015, now about two weeks post-injury, Wani sought treatment at Providence Newberg.  Sherman Decl., Ex. 2, p. 2, ECF #152 (noting triage at 4:13 p.m. and ER departure at 5:21 p.m.).  Brian Richard Duncan, M.D., ordered an x-ray of Wani's thumb.  Steven E. Zinck, M.D., the radiologist who prepared the x-ray report, concluded that the "bones, joints, and soft tissues are within normal limits for the patient's age."  *Id*., at 4, 6.  Dr. Duncan nevertheless diagnosed a closed left thumb fracture and advised Wani to follow up with Dr. Croy in a week.  *Id*., at 2.

On Friday, September 4, 2018, Johnstone conducted an "Investigation Meeting" with Wani, who was accompanied by Bujnowski.  Complaint, Att. A at 6-14, ECF #1-1.  According to the contemporaneous notes taken by Sarah Taylor, Wani recounted being sent a copy of Fix-Gonzalez's edited photo and learning that it was posted on Instagram.  He also told Johnstone about Fix-Gonzalez approaching him before lunch and telling he would take the posts down, and about his email to Casey.  Wani reported that Casey called him that evening and advised him that Fix-Gonzalez was taking the posts down.  Wani also stated that his thumb had been broken on either August 20 or 21st, but that he was not permitted to leave practice to have it examined.  Wani presented Sarah Taylor with a copy of his post-visit summary from Providence Newberg.  Wani Decl. 3-4, ECF #171.  He told Johnstone and Sarah Taylor he was leaving GFU and planned to move back to Washington by Tuesday, September 8, 2015.  Johnstone Decl., Ex. C, p. 6, ECF #159.

On Monday, September 7, 2015, Wani sent a lengthy email to Casey, advising him that Wani had not been at practice because of the poor handling of the situation with Fix-Gonzalez, and due to the unwillingness of GFU football staff to release him from practice to have his thumb examined.  Casey Decl., Ex. B, ECF #156.  He further advised Casey that he had

withdrawn from his classes at GFU, but did not mention that he felt the lack of treatment was racially motivated.  Casey viewed Wani's complaint as based solely on a difference of medical opinions.  *Id*. ¶ 23, Ex. B.

That same day, Boughton learned from Casey that Wani had quit the football team and withdrawn from GFU.  Boughton Decl. ¶ 8.  Casey also advised Boughton that Wani had complained about the treatment of his thumb injury and been diagnosed with a broken thumb at Providence Newberg.  *Id*. ¶ 9.  Boughton knew that Dr. Croy had admitting privileges at Providence and contacted him to get further information.  On September 8, 2015, Dr. Croy reviewed the x-ray taken of Wani's hand on September 2, 2015, and concluded that there was no fracture.[5]  Croy Decl., ¶¶ 7-8, ECF #150.

By September 9, 2015, Wani had returned to Washington, intending to re-enroll in Eastern Washington University.  Johnstone Decl., Ex. A, p. 3, ECF #159; ECF #168-1, at 12.  On September 15, 2015, Wani sought further treatment with Bradley Kuske, D.O., at MultiCare Orthopedics & Sports Medicine in Covington, Washington.  ECF #171-1 at 9-12.  Dr. Kuske diagnosed closed, nondisplaced fractures of the neck of the first metacarpal bone of the left hand and the proximal phalanx of the left thumb, advised Wani to wear a short arm thumb spica cast for two more weeks, then "wean" to a velcro wrist spica cast.  *Id*. at 9.

---

[5]  Dr. Croy asserts that GFU student athletes signed "Consent for Disclosure of Protected Health Information" forms as a condition for participation as intercollegiate athletes which "authorized health care personnel representing GFU to access health records to support athlete health" and that Wani signed such a form.  Croy Decl. ¶ 7.  However, Dr. Croy does not attach a copy of any such form signed by Wani to his declaration, and the form by that name signed by Wani and attached to Boughton's declaration only authorizes GFU  team physicians to "release" health information to other health care providers, not to "access" health information created by third parties.  Boughton Decl., Ex. B, ECF #151-2.  Nevertheless, as discussed in this court's prior opinion, Wani has no private right of action for money damages under 42 USC § 1320d-6.  Findings and Recommendation 13, ECF #128.  Nor has Wani alleged any claim that turns on the scope of the consent in either his original Complaint or his proposed First Amended Complaint.

On September 11, 2015, Johnstone forwarded all the information he had compiled about Wani's complaint to Pothoff. At that time, Johnstone did not interpret Wani's complaint about the response to his thumb injury as alleging any form of racial discrimination by the football coaching staff or athletic training staff. Johnstone Decl., ¶ 10, ECF #159.

On September 18, 2015, Pothoff issued a letter advising Wani of GFU's decision regarding the "cyberbullying" incident involving Fix-Gonzalez. Complaint, Att. A, at 1-3, ECF #1-1. Fix-Gonzalez lost his good standing with GFU, and was required to write an apology letter to Wani, engage in cultural sensitivity training, and not post any further "lookalike" pictures on any social media. *Id*. at 1. Pothoff's letter also advised Wani that Boughton had no authority to deny anyone the ability to seek additional medical treatment, and that Boughton had spoken with Dr. Croy "and found out that [Wani] had gone in for an x-ray and that Dr. Croy had reviewed the x-ray and [Wani's] thumb, and also came to the conclusion that it was not broken."[6] *Id*.

---

[6] Despite the statement in Pothoff's letter, that Dr. Croy had "reviewed the x-ray, *and [Wani's] thumb*" (emphasis added), Dr. Croy had not—and never did—examine Wani's thumb. Wani repeatedly quotes and characterizes Pothoff's statement as a "lie," and himself emphasizes that he has never been treated by Dr. Croy. On that fact, the parties agree: Dr. Croy never treated Wani. Croy Decl. ¶ 10, ECF #150; Wani Decl. 4 and Ex. 5, at 2, ECF #171. The record permits no conclusions but that: (1) Dr. Croy's sole involvement in the months predating this lawsuit was to review the September 2, 2015 x-ray of Wani's thumb and advise Boughton via text message that Dr. Croy did "not see a fracture on the thumb" (Croy Decl., ¶¶ 7-8 and Ex. A, ECF #150 and #150-1); and (2) the statement in the letter from Pothoff erroneously describes a medical examination of Wani's thumb by Dr. Croy that never took place.

Wani contends that, during the course of this lawsuit, GFU's employees and attorneys maintained that Dr. Croy had in fact examined his thumb but could not produce medical records to substantiate that claim, so were forced to come up with a "new adopted theory" during discovery conferences in this case. Wani Decl. 7-8, ECF #171. However, no evidence supports Wani's contention. The first months of this case were consumed with motions entirely unrelated to that issue. By November 2017, it was clear that Wani attributed the erroneous statements in Pothoff's letter to Dr. Croy (ECF #97, ECF #107-6), but that all parties agreed that Dr. Croy had never examined Wani's thumb or otherwise treated him. *See* ECF #27 (Dr. Croy's Answer, admitting only that he is an orthopedic physician and otherwise denying Wani's allegations or having no knowledge or information sufficient to form a belief as to their truth); ECF #97.

Wani alleges that GFU and its insurer improperly refused to pay for needed follow-up treatment and surgery related to the injury he sustained at football practice. Wani Decl. 8, ECF #171. On July 1, 2016, Wani was seen by orthopedic surgeon, Grant Lohse, M.D., and diagnosed with left thumb instability with laxity of the ulnar collateral ligament and likely prior rupture. *Id*. at 5. On November 10, 2016, Wani underwent reconstructive surgery of his left thumb. He contends that his thumb has never fully healed or regained the level of function it had prior to the August 20, 2015 injury. ECF #152-7, at 10.

## II.    Motion to Amend

### A.    Proposed Claims

In his proposed First Amended Complaint (ECF #168-1) ("FAC"), Wani sets out five proposed claims for: (1) personal injury against Boughton, Casey, Dr. Croy, and GFU; (2) intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED") against Fix-Gonzalez, GFU, and all individual GFU defendants except Boughton and Craig Taylor; (3) fraud against GFU, Dr. Croy, Sarah Taylor, Craig Taylor, and Pothoff; (4) breach of contract against Boughton, Craig Taylor, and GFU; and (5) racial discrimination against GFU.

### B.    Legal Standard

In evaluating the propriety of granting leave to amend, courts are directed to consider five factors, including bad faith, undue delay, prejudice to the opposing party, futility of the

---

Nothing in the record supports the conclusion that Dr. Croy had any control over the contents of the letter from Pothoff, or agreed with the representation that he had examined Wani's thumb. Wani persists in contrasting Dr. Croy's alleged findings (as erroneously stated in Pothoff's September 18, 2015 letter) against the findings of his medical providers as the centerpiece of his claims. Wani Decl. 6-7, ECF #171. However, that alleged disagreement is both refuted by the record and—other than as historical background information—irrelevant to Wani's claims.

amendment, and whether there have been previous amendments. *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). "Leave to amend is warranted if the deficiencies can be cured with additional allegations that are consistent with the challenged pleading and that do not contradict the allegations in the original complaint." *Id.* (internal quotation marks and citation omitted). However, denial of leave to amend is proper if the court "determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (internal quotation marks and citation omitted).

### C.    Failure to Confer

Defendants contend that Wani's request to amend can be denied because he failed to adequately confer with opposing counsel prior to filing the motion. Local Rule 7-1(a) requires that the first paragraph of every motion certify that the party filing the motion has made a "good faith effort through personal or telephone conferences to resolve the dispute" and, on a dispositive motion discuss "each claim, defense, or issue that is the subject of the proposed motion." Wani's merely asserts that he "informed the defendant's counsels of my intent to file an amended complaint" and "made it clear . . . of the pro[po]sed changes that I was going to make and those changes were also pointed out in court recommendations." M. Amend 1, ECF #168. Two weeks after Judge Hernandez's Order, Wani advised defense counsel he was going to amend to reallege Claims 1, 2, 3, and 6, and sought "permission to add . . . 1 or 2 new claims." Decl. Martin Jaqua, Ex. A, ECF #178. In response to defense counsel's request that he provide a copy of his proposed amendments, Wani stated he was going to make "the changes that [the court] pointed out for me to make." *Id*, at 1. After defense counsel responded that Wani's explanation was not adequate for conferral purposes, Wani responded that he would draft his motion as he saw fit and defense counsel could "oppose it as you wish." *Id.*

This effort does not meet the letter or the spirit of the local rule.  Without a copy of the proposed amendments or even any summary of the proposed changes, defense counsel had no opportunity to even evaluate the changes Wani had in mind.  The result is a drain on the resources of the attorneys and the court to evaluate claims, the filing of which might have been avoided altogether had any legitimate conferral taken place.  This alone is reason enough to deny Wani's motion to amend.

### D.    Formatting and FRCP 8

Wani has also disregarded basic formatting requirements under FRCP 10 and Local Rule 10-1, and submitted a lengthy, rambling pleading that nowhere contains the type of "short and plain statement" of his claims contemplated by FRCP 8.  GFU's Resp. to Pl.'s M. Amend 9-13, ECF #177.  A non-incarcerated *pro se* party is held to the same standard as litigants represented by counsel:  "we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."  *McNeil v. United States*, 508 U.S. 106, 113 (1993).  In short, *pro se* litigants must follow the same rules of procedure as do other litigants.  *Ghazali v. Moran*, 46 F.3d 52, 53 (9th Cir. 1995) (citation omitted).  Given the entire year that Wani has had to familiarize himself with the procedural rules since filing this case, this court is not of a mind to excuse the formatting deficiencies of his proposed amended pleading.  However, even were this court inclined to do so, the relevant factors considered under FRCP 15 would tip the balance against allowing amendment.

### E.    Delay, Prejudice, Bad Faith

Wani has not previously amended his pleadings.  Nevertheless, defendants assert that Wani's eleventh-hour request to amend should be denied because it was the product of undue delay and bad faith and would prejudice their clients.

Although this court did not set a deadline for Wani to amend his complaint, Judge Hernandez's April 5, 2018 Order clearly contemplates Wani would do so, indicating the types of allegations necessary for Wani to preserve his claims. Order, ECF #146. Despite that guidance, Wani did not immediately file a motion to amend. Three weeks after Judge Hernandez's Order, and a week after Wani's emails alerting defendants that he intended to amend his pleadings, Fix-Gonzalez filed his Motion for Judgment on the Pleadings (ECF #148), and the GFU defendants filed their two Motions for Summary Judgment (ECF ##149, 153). Only after filing his responses to two of those motions (ECF ## 163, 167), did Wani finally file his Motion to Amend (ECF #168) on May 22, 2018, over six weeks after Judge Hernandez's Order.

Wani offers no explanation as to why he failed to seek to amend his complaint sooner. When Wani filed his motion on May 22, 2018, the close of discovery was less than two weeks away. *See* ECF # 137. By that time, the defendants had filed dispositive motions seeking judgment against each of the remaining claims and briefing on the pending dispositive motions was well underway. All of this counsels against allowing amendment: "The timing of the motion, after the parties had conducted discovery and a pending summary judgment motion had been fully briefed, weighs heavily against allowing leave. A motion for leave to amend is not a vehicle to circumvent summary judgment." *Schlacter-Jones v. Gen. Tel. of Cal.*, 936 F.2d 435, 443 (9th Cir. 1991) (citations omitted).

Assuming this court looked past the delay, the proposed amended pleading reveals no new information to shore up Wani's claims. Instead, it rehashes, albeit under newly-titled claims, the same now years-old information about his hand injury, victimization on social media, the dispute that followed regarding payment for his surgery and follow-up medical care, and

Wani's views about the punishments that should be meted out. Thus, the record reveals no newly-discovered information that might serve to justify the delay.

Additionally, and as discussed more fully below, this court agrees with defendants that the new pleading does not appreciably change the claims previously asserted by Wani that were already dismissed by this court. *See* ECF #177, at 5-6, 16-19. Such conduct reflects bad faith and is prejudicial to defendants who must then unnecessarily reassert the same defenses.

### F.    Futility

In his proposed FAC, Wani seeks to consolidate his Second and Third Claims into a single personal injury claim, reallege his claim for racial discrimination only as against GFU, reallege his claim for breach of contract to add Boughton and Craig Taylor as defendants, and add claims for IIED/NIED and fraud. However, when considered in light of the undisputed evidence now in the record, Wani's realleged or newly alleged claims fail.

#### 1.    Personal Injury

In his proposed claim for "Personal Injury," Wani realleges that Boughton caused further injury to his thumb by refusing to allow him to leave practice to seek medical attention, and repeatedly disregarding his assertions that he had a broken thumb or torn ligament. ECF #168-1, at 3-4. Wani alleges that Casey contributed to the worsening of his injury by issuing an edict that players not leave football practice, thereby leaving him at Boughton's mercy. *Id.*, at 4-5. Wani seeks to hold GFU liable for negligent hiring, retention, supervision, and training of Casey and Boughton. *Id.*, at 5. Finally, Wani alleges that Dr. Croy misrepresented that he had treated his thumb and found no fracture, causing a delay of treatment and further injury to him. *Id.*, at 6.

The difficulty with this proposed claim is that it depends on the same narrative that this court already found lacking. Any personal injury claim premised upon a misdiagnosis requires

allegations of improper treatment resulting in injury to the plaintiff following the alleged misdiagnosis. Findings and Recommendation 9, ECF #128. Wani's proposed personal injury claim against Boughton and Casey continues to lack that central allegation. Moreover, "[i]t is well established under Oregon law that, in most medical malpractice cases, expert testimony is required to establish the standard of care." *Thorson v. Bend Memorial Clinic*, 291 Or. App. 33, 36 (2018) (citations, brackets, and internal quotation marks omitted). Wani has not identified, much less provided any evidence from, any such expert. This court should not allow a redo of the same pleading unsupported by expert testimony.

The allegations against Dr. Croy also remain problematic. It is undisputed that Dr. Croy never examined or treated Wani. Instead, Dr. Croy merely reviewed an x-ray and sent a text message to Boughton that the x-ray showed no fracture. By that time, Wani had already quit attending GFU. Based on this record, there is no basis for a claim against Dr. Croy, because Wani cannot establish a duty running to him from Dr. Croy and a corresponding breach of that duty. *See Stevens v. Bispham*, 316 Or. 221, 227 (1993) (citing *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or. 1, 14-15 (1987)). There is also no evidence whatsoever that Dr. Croy's statement to Boughton was passed on to any subsequent medical provider to Wani's detriment. Mot. J. on Pldgs. 10-11, ECF #149.

This leaves only Wani's proposed claim against GFU for negligent hiring, retention, supervision, and training of Casey and Boughton. This proposed claim hinges on the underlying claim against Casey and Boughton. Where the alleged tortious conduct is insufficient to support a claim against the individual defendants, a claim alleging vicarious liability premised upon that same conduct also fails. *Checkley v. Boyd*, 198 Or. App. 110, 134 n.14 (2005). Without sufficient allegations against Casey and Boughton, the claim against GFU also fails.

### 2.    IIED/NIED

To prevail on his newly-alleged IIED claim, Wani must establish that:  (1) defendants "intended to cause plaintiff severe emotional distress or knew with substantial certainty that their conduct would cause such distress;" (2) defendants "engaged in outrageous conduct, *i.e.* conduct extraordinarily beyond the bounds of socially tolerable behavior;" and (3) such "conduct in fact caused plaintiff severe emotional distress." *House v. Hicks*, 218 Or. App. 348, 357-58 (2008) (citation omitted).  The alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 358 (citation and internal quotation marks omitted).  While "the inquiry is fact-specific, the question of whether the defendant's conduct exceeded the farthest reaches of socially tolerable behavior is, initially, a question of law." *Gordon v. Kleinfelder W., Inc.*, 2012 WL 844200, *14 (D. Or. Mar. 12, 2012) (citation and internal quotation marks omitted).

Wani alleges that Fix-Gonzalez posted two racially insensitive photos on Instagram, then was "bragging" that he planned to make another one, showed no remorse, and promised to make more, all in violation of GFU's Student Life Policies.  ECF #168-1 at 8.  Casey, Bates, Sanders, and Haberly learned about the post on August 27, 2015, but failed to immediately report it to student life officials, allegedly in an effort to protect Fix-Gonzalez from being kicked off of the football team.  *Id.* at 8-9.  Johnstone, Pothoff, and Sarah Taylor then allegedly failed to conduct an adequate or proper investigation of Fix-Gonzalez's conduct.  *Id.* at 10.  Finally, Wani alleges that GFU is "vicariously liable" for the conduct of these individual defendants based on its negligent hiring, retention, supervision, training of the individual GFU defendants.

Wani's allegations simply do not reflect conduct that was an "extraordinary transgression of the bounds of socially tolerable conduct" or "outrageous in the extreme" so as to support liability. *See* Fix-Gonzalez's Mot. J. on Pldgs. 8-13, ECF #148. Nothing in the record indicates any prior discord between Wani and Fix-Gonzalez or any other GFU student. Fix-Gonzalez posted two memes for a short time, then voluntarily removed them when he learned they upset Wani. With regard to GFU's athletic and administrative staff, the record reveals that, at worst, they took eight days, from the day Wani reported the post (August 27, 2015), to respond with an investigative meeting regarding Fix-Gonzalez's conduct (September 4, 2015). Despite Wani's departure from Oregon, GFU concluded its investigation within two weeks and imposed punishment on Fix-Gonzalez. This course of conduct is simply insufficient to allow a reasonable inference that defendants were intentionally inflicting emotional distress on Wani by disregarding his complaints. *See T.L. ex rel. Lowry v. Sherwood Charter Sch.*, 68 F.Supp.3d 1295, 1320 (D. Or. Dec. 18, 2014). Moreover, the thrust of the IIED claims against Casey, Bates, Sanders, Haberly, Johnstone, Pothoff, and Sarah Taylor is that they failed to respond to or properly investigate Wani's complaints of harassment by Fix-Gonzalez. However, "mere nonresponsiveness" to claims of harassment is insufficient to support liability for IIED. *Wheeler v. Marathon Printing, Inc.*, 157 Or. App. 290, 308 (1998).

Wani's claim for NIED is not supported by any allegation of physical harm inflicted on him by any defendant. "Where a plaintiff seeks redress for emotional injury alone, liability for negligence must have a legal source that goes beyond the common-law duty to exercise reasonable care to prevent foreseeable harm." *Shin v. Sunriver Preparatory Sch., Inc.*, 199 Or. App. 352, 365 (2005) (citations omitted). Moreover, "the legally protected interest so identified must be of sufficient importance to warrant the award of damages for emotional distress." *Id*.

(citations omitted). The only relationship alleged between Wani and the GFU defendants is that of a university football player and university athletic or administrative staff, which does not suffice. *See Austin v. Univ. of Ore.*, 205 F.Supp.3d 1214, 1229 (D. Or. Sept. 8, 2016) ("There exists no precedent in Oregon or the Ninth Circuit recognizing a special relationship between college students or student athletes and the universities they attend."). Moreover, as discussed above, insufficient allegations of tortious conduct by the immediate tortfeasor is fatal to the related claim premised on a theory of vicarious liability based on the same conduct.

### 3.      Breach of Contract

Wani also seeks to reallege his claim for breach of contract. He originally brought that claim only against GFU, alleging that he had a "binding contract with [GFU]" requiring GFU to pay for medical expenses related to injuries sustained while participating in football team-related activities. Complaint 11, ECF #1. This court dismissed that claim based on a lack of allegations about the existence and terms of the contract. Findings and Recommendations 9-10, ECF #128, adopted by Order, ECF #146. In his proposed amended pleading, Wani seeks to reassert a breach of contract claim against not only GFU, but also against Boughton and Craig Taylor. ECF #168-1, at 18-20. He identifies the relevant policy as "US561631," effective August 1, 2015, through August 1, 2016. *Id*. at 18. That policy, issued by United States Fire Insurance Company, identifies GFU as the policyholder, with coverage for intercollegiate athletes on official team rosters, including GFU's football team, for payment for medically necessary treatment for injuries sustained during sports practice sessions. ECF #139-3, at 1, 3, 7.

This breach of contract claim is not properly directed at the individual GFU defendants, who are not parties to the policy. Nor does the claim against GFU withstand scrutiny. *See Philips v. Clark Cnty. Sch. Dist.*, 2011 WL 4343979 (D. Nev. Sept. 14, 2011) (dismissing breach

of contract claim against school district based on disability insurance policy issued to provide coverage for student athletes). Thus, although the existence and terms of the policy are now in the record, they provide no support for the breach of contract claim alleged by Wani.

### 4.    Fraud

In his newly-proposed "Fraud" claim, Wani contends that, during the September 4, 2015 investigatory meeting, Sarah Taylor surreptitiously took photos of the post-visit summary from his visit to Providence Newberg on September 2, 2015, shared it with other GFU employees and with Dr. Croy, who in turn "deliberately lied" about treating Wani. ECF #168-1, at 12-17; Wani Decl. 3-4, ECF #171. Wani seeks to hold Sara Taylor responsible for sharing his post-visit summary and Dr. Croy responsible for his alleged ongoing "lies," which Wani claims delayed necessary treatment and were driven by Dr. Croy's intent to protect GFU from having to pay for follow-up treatment for his injury and to protect Boughton from discipline. ECF #168-1, at 13-15. He contends that Craig Taylor refused to honor his request for follow-up treatment, and seeks to hold Craig Taylor liable as the athletic director for failing to ensure that GFU upheld its own "compliance rules," as well as those of the NCAA. *Id*., at 15. He alleges that Pothoff refused to listen when he called to correct the assertion in the September 18, 2015 letter that Dr. Croy had treated him, and that Pothoff's actions resulted in a delay of treatment and an exacerbation of his injury. *Id*. at 16. Finally, Wani alleges that GFU is vicariously liable for its employees' actions, including the actions that delayed necessary treatment and exacerbated his thumb injury. *Id*. at 17.

A common law fraud claim requires allegations that: (1) the defendant made a material misrepresentation that was false; (2) the defendant did so knowing the representation was false; (3) the defendant intended the plaintiff to rely on the misrepresentation; (4) the plaintiff

justifiably relied on the misrepresentation; and (5) the plaintiff was damaged as a result of that reliance. *Strawn v. Farmers Ins. Co. of Ore.*, 350 Or. 336, 351-52 (2011). Here, the only alleged misrepresentation is the statement in Pothoff's letter that Dr. Croy had examined Wani's thumb. Assuming for the sake of argument that the statement was a deliberate misrepresentation, the record nevertheless reveals no basis for Wani's justifiable reliance on it. Wani has repeatedly denied that Dr. Croy ever examined him. He apparently contacted Pothoff and told him so after receiving Pothoff's letter and has presented no evidence of reliance whatsoever. In short, whether characterized as a mistake or a "lie," the statement in Pothoff's letter asserting that Dr. Croy had examined Wani's thumb simply provides no traction for a fraud claim.

> **G.      Conclusion Regarding Motion to Amend**

Because it was filed without adequate conferral under Local Rule 7-1(a), fails to comply with FRCP 8 and 10, was filed only after discovery was nearly closed and defendants' dispositive motions were already pending, and proposes only claims against which defendants are entitled to judgment or new claims that are fatally flawed, Wani's Motion for Leave to File an Amended Complaint (ECF #168) should be DENIED.

**III.    Requests for Judgment Against Remaining Claims**

As noted above, this court previously dismissed all claims against the GFU defendants, except the Fourth Claim. Assuming the above recommendation to deny Wani's request to amend his pleadings is adopted, Wani is left with only three pending claims, namely: (1) the First Claim for Cyberbullying and Racial Verbal Harassment, as against Fix-Gonzalez; (2) the Third Claim for Negligence, as against Dr. Croy; and (3) the Fourth Claim against Sarah Taylor, Boughton, and GFU. For the reasons that follow, defendants are entitled to judgment against each of those claims.

A.      **Judgment on the Pleadings**

Motions for judgment on the pleadings have been filed regarding all claims against Fix-Gonzalez (ECF #148) and against the Fourth Claim against the individual GFU defendants (ECF #138).[7]  The First Claim alleges counts for "Cyberbulling" and "Racial Verbal Harassment" against Fix-Gonzalez.  Complaint 9, ECF #1.  As near as can be discerned from Wani's Complaint, the race-based claims against Fix-Gonzalez (part of the First Claim) and against the individual GFU defendants (part of the Fourth Claim) are both premised upon Title VI of the Civil Rights Act of 1964, 42 USC § 2000d, and will be discussed together.  The remaining claim for "Cyberbulling" against Fix-Gonzalez is discussed separately.

1.      **Cyberbullying**

Rather than responding substantively to Fix-Gonzalez's motion, Wani urged this court to await an amended pleading.  Wani Resp. 1, ECF #163.  However, as discussed above, this court should deny Wani's request to amend.  Wani's complete failure to respond to the substance of Fix-Gonzalez's motion constitutes a tacit concession of the merits of the motion.  *See Lykins v. Hohnbaum*, 2002 WL 32783973, at *3 (D. Or. Feb. 22, 2002) (finding plaintiff conceded dismissal of a claim on motion for summary judgment by not addressing it).  Nevertheless, this court will briefly discuss why the motions for judgment on the pleadings should be granted even without a substantive response by Wani.

Wani has not identified any statute that provides him with a claim for "cyberbullying."  Oregon does have a statutory requirement that school districts "shall adopt a policy prohibiting harassment, intimidation or bullying and prohibiting cyberbullying" and requiring school

---

[7]  GFU, as an institution, seeks summary judgment against the Fourth Claim.  That request is discussed below.

employees who witness such acts to report the acts to appropriate school officials.  ORS 339.356, 339.362.  However, nothing in the statute indicates that it applies to GFU, a private university.  To the contrary, the statute is part of the provisions on mandatory school attendance for children ages 6-18.  But, even assuming the statute applied to harassment or cyberbullying at a private university, "ORS 339.351 to 339.364 do not create any statutory cause of action."  ORS 339.364.  As Wani has identified no other basis for such a claim, Fix-Gonzalez should be granted judgment on the pleadings against the First Claim to the extent it alleges "Cyberbullying."

### 2.    Racial Harassment and Discrimination Claims

Wani alleges a claim for "Verbal Racial Harassment" against Fix-Gonzalez and for "Racial Discrimination and Hatred" against the individual GFU defendants.  Again, Wani does not respond to the substance of Fix-Gonzalez's motion, which is reason enough to grant that motion.  Moreover, Wani has identified no statutory basis for the "Verbal Racial Harassment" claim against Fix-Gonzalez.  There is no basis for suing a fellow university student under 42 USC § 2000d and, as just discussed, Oregon law provides no private statutory right of action under ORS Chapter 339.  Accordingly, the remaining portion of Fix-Gonzalez's motion against the "Verbal Racial Harassment" portion of the First Claim, should likewise be granted.

The Fourth Claim alleges that Boughton's refusal to allow Wani time off from football practice, and the actions by other coaches and GFU staff in response to Wani's complaints about Fix-Gonzalez's social media posts, was racially motivated.  The basis of the Fourth Claim appears to be Title VI of the Civil Rights Act of 1964, 42 USC § 2000d.  Complaint 7, ECF #1.  That statute provides that:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 USC § 2000d.

GFU employees may not be personally liable under 42 USC § 2000d:  "Title VI of the

Civil Rights Act . . . prohibits racial discrimination in any program or activity receiving federal

funds.  Accordingly, Title VI actions must be brought against an entity, not an individual."

*Naharaja v. Wray*, 2014 WL 3891754 at *2 (D. Or. Aug. 6, 2014) (citations omitted).  In

response, Wani quotes extensively from GFU's "Student Life Policies" and asserts that the

individual GFU employees' wages are "part of the federal funding's [sic] that the school gets

from the federal governments [sic]."  Pl.'s Resp. M. J. on Pldgs. 1-8, 10-11, ECF #143.  GFU's

policies are attributable to GFU, not to its individual employees and, in any event, condemn

racial harassment.  Moreover, the "wages" argument was flatly rejected in *Naharaja*:

> Naharaja responds that all of the individual defendants in some
> form are "recipients" of federal funds, with [their employer]
> OHSU being the "primary recipient." . . . Essentially, his argument
> is that OHSU receives federal funds, which are then funneled to
> the eighteen named individuals through paychecks and other
> employment compensation.  He does not, however, cite any legal
> authority for the proposition that employees are a "recipient" of
> federal funds if a portion of their pay comes from federal dollars,
> and the plain language of the statute refers to programs and
> activities, not individuals.

2014 WL 3891754 at *2.

In his motion, Fix-Gonzalez recognizes that the common law claim that seems most

aligned with Wani's allegations is for IIED.  Fix-Gonzalez's Mot. J. on Pldgs. 2, ECF #148.

However, as discussed above, even were Wani's allegations recast as an IIED claim, the sum

total of the conduct to which Wani was allegedly subjected, whether by Fix-Gonzalez or by the

individual GFU defendants, is insufficient to support a claim for IIED under well-established

Oregon law.  Accordingly, the motion of the individual GFU defendants for judgment on the pleadings against the Fourth Claim should likewise be granted.

### B.    Summary Judgment

Three summary judgment motions are presently before this court, including Wani's Motion for Summary Judgment (ECF #75), Dr. Croy's Motion for Summary Judgment (ECF #149), and the GFU defendants' Motion for Summary Judgment (ECF #153).  This court now considers those motions as against the only two remaining claims, namely:  (1) the Third Claim alleged against Dr. Croy; and (2) the Fourth Claim alleged against GFU as an institution.

### 1.    Third Claim for Negligence Against Dr. Croy

Dr. Croy seeks summary judgment against the Third Claim for negligence.  Dr. Croy's Mot. Summ. J. 2, ECF #149.[8]  That motion should be granted.

Wani seeks $30 million from Dr. Croy, all premised upon Dr. Croy's alleged actions of helping to "cover up" Wani's injury by "falsifying [Wani's] x-ray and medical records so that [GFU] would not have to pay for [Wani's] medical expenses, living [sic] [Wani] unable to play football and causing a lot of pain and suffering in [Wani's] life as a result."  Complaint 9-10, ECF #1.  The undisputed facts now establish that Dr. Croy never had any doctor-patient relationship with Wani.  Instead, Wani's claims are premised upon a mistaken statement in Pothoff's September 18, 2015 letter to Wani, asserting that Dr. Croy had reviewed Wani's x-rays "and Wani's thumb," when in fact Dr. Croy has never conducted any examination of Wani.  Dr. Croy did not examine, did not say he examined, was not asked to examine, and did not tell anyone at GFU that he examined Wani's thumb.  Furthermore, he denies having any

---

[8]  Dr. Croy was named as a defendant in the Fifth Claim, but that claim was dismissed with prejudice by this court's prior order, so no further discussion of the Fifth Claim is necessary.

involvement at all in the processing of Wani's claim with GFU's insurer for coverage of Wani's medical expenses and eventual surgery, and Wani has submitted nothing contradicting that assertion.  Dr. Croy Decl., ¶¶ 4, 9-11, ECF #150.

The record wholly supports Dr. Croy's outline of the necessary showings to establish a claim for medical negligence, the lack of a physician-patient relationship between himself and Wani, and the lack of evidence of any causal link between any of Dr. Croy's actions and the alleged exacerbation of Wani's thumb injury.  Mot. Summ. J. 10-15, ECF #10.  Wani offers no response to these arguments, instead offering to amend his pleadings, and asserting a failure by Dr. Croy to produce requested documents that will allegedly lead to discoverable materials.  Pl's Resp. 1, ECF #167.  This court has concluded that Wani's requests to compel and to amend his pleadings should be denied.  Viewed in detail and in the light most favorable to Wani, the undisputed evidence reflects no support for any causal linkage between Dr. Croy and Wani's thumb injury, the treatment Wani received (or failed to receive), the representations in the September 18, 2015 letter from Pothoff, or the processing of Wani's insurance claim.  Accordingly, Dr. Croy should be granted summary judgment against the Third Claim.

### 2.    Fourth Claim Against GFU

This leaves only the Fourth Claim, as alleged against GFU as an institution, for "Racial Discrimination and hatred."  GFU seeks summary judgment against that claim, which alleges that GFU, Boughton, and GFU "staff and coaches" discriminated against Wani on the basis of his race.  The Fourth Claim is premised upon an alleged refusal by GFU coaching staff to refer black football players to outside medical treatment or have time off to heal, while allowing white players to have access to outside medical care, providing them with immediate and premium treatment, and allowing them to take time off from practice when injured.

26 – FINDINGS AND RECOMMENDATIONS

As discussed above, Title VI prohibits race-based discrimination in programs or activities receiving federal financial assistance.[9]  42 USC § 2000d.  The elements of a claim under this provision include "membership in a protected class, meeting the school's legitimate educational expectations, an adverse educational action and worse treatment than that of similarly situated students not in the protected class."  *Brewer v. Bd. of Tee's of Univ. of Il.*, 479 F.3d 908, 921 (7th Cir 2007) (citations omitted).  When, as here, plaintiff alleges a disparate treatment claim that does "not involve official policy of the recipient entity," the plaintiff must also allege and prove that the recipient entity had prior actual notice of the alleged discrimination and that its response amounted to "deliberate indifference."  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998); *see also Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1034 (9th Cir 1998) ("When a district is 'deliberately indifferent' to its students' right to a learning environment free of racial hostility and discrimination, it is liable for damages under Title VI.") (citing *Gebser*, 524 U.S. at 289-90).  This standard requires that an institutional "official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails to adequately respond."  *Gebser*, 524 U.S. at 290.

Wani asserts there is a "long history of racism and discrimination" at GFU, but that there is, as yet, "no way to know who was really in charge letting all the discriminatory, hateful, negligent and criminal behaviors . . . cited in the complaint that took place stand for so long without any consequences . . . ."  Wani's Resp. to GFU's M. J. on Pleadings 7, 10, ECF #143.  Wani accuses GFU of refusing to reprimand its employees for their "hateful and discriminatory

---

[9]  For purposes of its motion, GFU assumes that the GFU football program fell within the "federal financial assistance" clause of Title VI.  GFU M. Summ. J. 6 n.1, ECF #153.

conduct," positing that GFU is "bailing out" its employees "in fear of a retaliation and wrongful termination lawsuit" they could have filed had GFU taken disciplinary action against them. *Id*. at 10.

However, Wani has submitted no evidence of prior notice of complaints of racial discrimination at GFU, and in particular, no evidence of complaints about racial discrimination in the provision of medical care to athletes. Furthermore, the evidence and chronology of events regarding Wani's treatment refute any basis for the conclusion that GFU was deliberately indifferent to Wani's complaints, either about the social media posts by Fix-Gonzalez or about his medical care. The record can be construed to establish that Wani disagreed with Boughton about the severity of his thumb injury. However, as discussed in detail in GFU's motion, the record is devoid of evidence that Wani complained about racial discrimination by members of the football coaching or athletic training staff until the Complaint was filed in this case, nearly two years after Wani left GFU. *See* Mot. Summ. J. 19-23, ECF #153.

Even were that failure of proof not fatal to Wani's Title VI claim against GFU, the claim nonetheless fails for lack of allegation or proof of any objectively adverse educational action. Nowhere in his submissions does Wani specifically identify the alleged adverse educational action on which his claim rests. However, as GFU argues, Wani's claim seems most analogous to one premised on an employer's refusal to allow an employee to take time off to see a doctor. The unrebutted evidence that Wani was not precluded from seeking out independent medical advice, as he finally did on September 2, 2015, eliminates any claim premised on that theory. Nor can Wani rely on the theory that he suffered educational or academic consequences by quitting the team, as the unrefuted evidence establishes that Wani's academic status was not conditioned on or affected by his participation in GFU's football program. In short, neither

Wani's allegations, nor the undisputed evidence now in the record, permit the conclusion that Wani suffered an objectively adverse educational action sufficient to support liability under Title VI.[10]

The failure of allegations or proof on these elements of Wani's Fourth Claim against GFU are reason enough to grant judgment in GFU's favor on that claim. Nevertheless, GFU vehemently denies—and has submitted evidence refuting—the inference that similarly situated white athletes received preferential time off practice or superior medical care for their injuries as compared with black athletes. Wani identified several players as examples of white players that allegedly received better medical care or time off, in comparison to himself and another black player who he claims were either yelled at for seeking out independent medical care (Aubrey) or provided inadequate treatment (Wani). *See* Wani Decl. 9, ECF #171. The white athletes include football players who were: (1) sent to the doctor for a hand scrape; (2) had ankle surgery within 24 hours for a sprained ankle; (3) kept off of practice and provided with a knee brace for a hyperextended knee; and (4) given a brace and held out of practice for a week for a chronically dislocated knee. *Id*; *see also* Jaqua Decl. Ex. B, p.2, ECF #158. GFU responded with evidence on those injuries and an exhaustive search of its records to identify any other athletes referred to outside medical providers or who saw outside medical providers for hand or finger injuries during calendar years 2015 and 2016. Mot. Summ. J. 15-19, ECF #153. This court will not recount that evidence here. Suffice it to say that the evidence permits no inference of racial

---

[10]  In an effort to cover any potential theory Wani may assert on this element of his Title VI claim, GFU posits that Wani may contend that its athletic staff refused to excuse him from the "contact" portions of preseason practice. Mot. Summ. J. 40, ECF #153. However, this theory (to the degree it is raised) is missing any component of an adverse "educational" action. GFU also posits a possible third alternative theory Wani may attempt to advance, in the form of the "threat" of discipline if he went to see an outside medical provider. *Id*. at 42-45. However, this court agrees that a mere threat of adverse action does not suffice to support a Title VI claim.

discrimination, but instead reflects referral decisions made based on GFU's objective referral criteria. *Id*.; *see also* Isaak Decl. ¶¶ 4-15.

Wani's claim against GFU suffers from failures to allege and prove several of the basic elements of a successful Title VI claim. Accordingly, GFU should be granted summary judgment against Wani's Fourth Claim.

**IV.    Motion for Sanctions**

Finally, Wani has filed a Motion for Sanctions (ECF #179) asserting that GFU's attorney, Martin William Jaqua ("Jaqua"), assisted by or impersonating a newspaper reporter, Seth Gordon ("Gordon"), "illegally" acquired information from him for use in these proceedings. Wani cites several phone calls originating from "[s]omeone" who "disguised" themselves as Gordon and thereby obtained his cell phone number and "personal and background information" about him from Bujnowski. M. Sanctions 1, ECF #179. The unidentified person sought information about his lawsuit against GFU and, though Wani "attempted to dodge the interview a few times," he eventually was the victim of an "illegal interview" conducted and "wire tapped" on July 10, 2017. *Id*. at 1-3. Based on the use of "everything that was discussed in that interview" during the various stages of this proceeding, Wani asserts that Jaqua and Dr. Croy's attorney, Mark Sherman, adopted a changing narrative about what transpired between Wani and the various defendants. *Id*. at 3. Wani urges this court to obtain the "wiretap recording of the interview" and impose sanctions accordingly. *Id*. at 4. Wani attaches a newspaper article, apparently published in the Newberg Graphic on July 19, 2017, as well as lengthy text message and email conversations apparently between him and Gordon. ECF #179-1, at 1-7.

Defense counsel deny any impropriety (GFU Resp. 2-4, ECF #187) and Gordon denies any contact at all on any matter with Jaqua (Gordon Decl. ¶ 6, ECF #188). Jaqua denies ever

hearing of Wani, representing GFU or any of its employees, or communicating in any way with anyone about Wani or his dispute with the GFU defendants at any time prior to August 14, 2017. Jaqua Decl. ¶¶ 11-16, ECF #181. A careful review of the materials that Wani has submitted reveals that Wani agreed to be interviewed by Gordon and then, when the Newberg Graphic article was published, demanded that a different picture accompany the article, disputed the accuracy of the reporting, and accused Gordon of various torts.

This court finds no cause to impose sanctions based on the course of events described in Wani's materials, primarily because he complains about the conduct of a newspaper writer, not about the conduct of attorneys, law firms, or parties to this litigation. FRCP 11(c)(1) (allowing imposition of sanctions on "any attorney, law firm, or party" who violates FRCP 11(b)). To the degree Wani seeks sanctions against defense counsel, he has submitted no evidence they were involved in nefarious conduct with Gordon and no evidence indicating that they did anything even mildly out of the ordinary, much less "illegal." As for changing the narrative to account for newly acquired information, attorneys are not only expected—but obligated—to present their client's cause in a way that fits the evidence. Zealous advocacy, undertaken to fulfill that obligation on behalf of a client, is not grounds for the imposition of sanctions under FRCP 11(c). Accordingly, Wani's Motion for Sanctions (ECF #179) should be DENIED.

## RECOMMENDATIONS

For the reasons stated above, this court recommends that: (1) Wani's Motion for Summary Judgment (ECF #75), Motion for Leave to File an Amended Complaint (ECF #168), and Motion for Sanctions (ECF #179) should be DENIED; and (2) the individual GFU defendants' Motion for Judgment on the Pleadings (ECF #138), Fix-Gonzalez's Motion for Judgment on the Pleadings (ECF #148), Dr. Croy's Motion for Summary Judgment (ECF #149),

and the GFU defendants' Motion for Summary Judgment (ECF #153) should be GRANTED,

and all remaining claims in Wani's original Complaint should be dismissed with prejudice.  To

the degree these motions address matters not specifically discussed above, the motions should be

DENIED as MOOT.  Accordingly, this court should enter judgment for defendants on all claims.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if

any, are due Wednesday, August 22, 2018.  If no objections are filed, then the Findings and

Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings

and Recommendations will go under advisement.

## NOTICE

These Findings and Recommendations are not an order that is immediately appealable to

the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal

Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED August 8, 2018.


/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge